# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS | ) Case No. 22-SC-2408 |
| STORED AT PREMISES CONTROLLED BY TWO | ) |
| PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

Located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| 18 U.S.C. § 1343 (Wire Fraud);  18 U.S.C. § 1341 (Mail Fraud);  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_telephone_____ *(specify reliable electronic means)*.

Date:    9/16/2022

_____
*Judge's signature*

City and state:    Washington, D.C.

_____
G. Michael Harvey
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY TWO<br>PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  22-SC-2408 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the jurisdiction of the _____District of Columbia_____.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____September 30, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____9/16/2022_____

City and state: _____Washington, D.C._____     _____G. Michael Harvey_____
                                     *Judge's signature*

                                               G. Michael Harvey<br>                                          United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-2408 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____

*Executing officer's signature*

_____

*Printed name and title*

**<u>ATTACHMENT A-1</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the Apple account identified by  and which is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

**ATTACHMENT A-2**
**Property to Be Searched**

This warrant applies to information which is associated with the Google account identified by ███████████████ and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

**ATTACHMENT B-1**

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Apple, Inc. ("PROVIDER") to facilitate execution**
      **of the warrant**

To the extent that the information described in Attachment A-1 is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A-1:

a.    For the time period July 1, 2021 to the present: The contents of all communications

and related transactional records for all PROVIDER services used by an Account subscriber/user

(such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage

services, remote computing services, instant messaging or chat services, voice call services, or

remote computing services including iCloud), including but not limited to incoming, outgoing, and

draft e-mails, messages, calls, chats, and other electronic communications; attachments to

communications (including native files); source and destination addresses and header or routing

information for each communication (including originating IP addresses of e-mails); the date, size,

and length of each communication; and any user or device identifiers linked to each

communication (including cookies);[1]

---

[1] Here, PROVIDER's other services include: iMessage (instant messages); FaceTime (video
calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access,
share, and synchronize data across various digital devices, for example iCloud Photo Library and
My Photo Stream for images and videos, iCloud Drive for documents, including presentations and
spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity
apps), and iCloud Keychain (to store various usernames and passwords, credit card information,

b.    For the time period from July 1, 2021 to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including iCloud), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.    For the time period from July 1, 2021 to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.    For the time period from July 1, 2021 to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.    All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of

---

and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

      f.     All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"));

      g.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.    For the time period from July 1, 2021 to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    For the time period from July 1, 2021 to the present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to:



II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning any and all efforts to fraudulently obtain and sell shipping labels, including ▆ labels, including attempts to obtain access to or to access corporate shipping label accounts, to use stolen shipping

labels, to market shipping labels for sale, and to sell or otherwise distribute shipping labels;

(f) Information, including messages, communications, emails, notes, documents, audio recordings, pictures, video recordings, or still captured images, that constitutes any effort to fraudulently obtain access to or sell shipping labels;

(g) Information regarding individuals from whom ███ or others obtained access to corporate shipping label accounts;

(h) Information regarding the identity and whereabouts of any co-conspirators; and

(i) Evidence of financial transactions between ███ and any co-conspirators.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**ATTACHMENT B-2**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
      execution of the warrant**

To the extent that the information described in Attachment A-2 is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A-2:

a.    For the time period August 1, 2021 to the present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services including Google Drive), including but not limited to

incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of e-mails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies);[2]

---

[2] Here, PROVIDER's other services include:  electronic communication services such as Google
Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video
chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo
sharing), and YouTube (video sharing); web browsing and search tools such as Google Search
(internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome
(web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs

b.      For the time period from August 1, 2021 to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including Google Drive), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period from August 1, 2021 to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period from August 1, 2021 to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

(word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

e.    All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.    All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account Google Cloud Messaging ("GCM"));

g.    Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period from August 1, 2021 to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.      For the time period from August 1, 2021 to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.      Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to:



**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning any and all efforts to fraudulently obtain and sell shipping labels, including ▆ labels, including attempts to obtain access to or to access corporate shipping label accounts, to use stolen shipping

labels, to market shipping labels for sale, and to sell or otherwise distribute shipping labels;

(f) Information, including messages, communications, emails, notes, documents, audio recordings, pictures, video recordings, or still captured images, that constitutes any effort to fraudulently obtain access to or sell shipping labels;

(g) Information regarding individuals to whom ███ provided access to corporate shipping label accounts;

(h) Information regarding the identity and whereabouts of any co-conspirators; and

(i) Evidence of financial transactions between ███ and any co-conspirators.

**III.     Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY TWO PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | SC No. 22-SC-2408<br><br>**Filed Under Seal** |

*Reference:    USAO Ref. #* ████████ ; *Subject Account(s):* ██████████
██████████

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, ████████████ being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with the following accounts (collectively, "the TARGET ACCOUNTS"):

    a.   Apple account ████████████████ ("TARGET ACCOUNT ONE"), which is stored at premises controlled by Apple, Inc. ("Apple"), an electronic communications services provider and/or remote computing services provider which is headquartered at One Apple Park Way, Cupertino, California.

    b.   Google account ████████████████ ("TARGET ACCOUNT TWO"), which is stored at premises controlled by Google LLC ("Google"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

2.      The information to be searched is described in the following paragraphs and in Attachments A-1 and A-2, which are incorporated by reference.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple and Google ("PROVIDERS") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 and B-2.  Upon receipt of the information described in Section I of Attachments B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2, using the procedures described in Section III of Attachments B-1 and B-2.

3.      

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) (the subject offenses) have been committed by ███ ████ ████ ████ ████ ████ ████ ████ and other unidentified individuals.  There is also probable cause to search the information described in Attachments A-1 and A-2 for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachments B-1 and B-2.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

7.      The FBI began investigating the fraudulent sale of ███████████████ shipping labels in response to a complaint from ████████████████ . that its ███ account had been compromised.  ████████████████ representatives told the FBI its ███ account had been accessed and used to fraudulently purchase shipping labels unrelated to ███████████ ████████ business.  ████████████████ believed the fraudulent label purchases began in approximately April 2021 and continued until approximately August 2021, when ████

███████████ became aware of the fraud and closed its compromised ████ account. ████

███████████ uncovered the fraud when individuals started complaining about missing

shipments of items such as tennis shoes, pool supplies, and headphones, none of which ████

███████████ sells.

8.    Through analysis of shipments fraudulently drawn on ████████████████

████ account and the interview of individuals associated with the shipments; the FBI identified

████████ ████ as a subject in this investigation. ████ obtained unauthorized access to

multiple company's ████ shipping accounts and sold labels drawn on those accounts to individuals

████ contacted through Discord[3] and other means of online communication. While

investigating ████ the FBI identified ████ ████ as a co-conspirator in the fraudulent ████

label sales scheme. As demonstrated later in this Affidavit, there is probable cause to believe ████

████ facilitated ████ and ████ unauthorized access to multiple corporate ████

accounts. Additionally, there is probable cause to believe ████ provided ████ access to

an ████████████ account (which ████ subsequently provided to ████ and ████

9.    On ████████, The United States District Court for the District of Columbia

issued a search warrant (Case No. ████████) authorizing the search of Discord account material

associated with ████ On ████████, The United States District Court for the District of

Columbia issued a search warrant (Case No. ████████) authorizing the search of Discord

account material associated with ████ Some of the probable cause presented in my affidavits

in support of the ████ and ████ Discord search warrants is incorporated in this Affidavit.

---

[3] Generally, per publicly available information, Discord is a VoIP (Voice over Internet Protocol), instant messaging, and digital distribution platform. Users communicate with voice calls, video calls, text messaging, media and files in private chats or as part of communities called "servers".

10.    In response to the ████ and ████ search warrants, Discord provided the FBI, among other things, electronic copies of ████ and ████ Discord communication history. The search warrant response materials included extensive communications in which many individuals asked to purchase shipping labels from ████ or ████ In response, ████ and ████ provided these individuals electronic copies of ████ shipping labels they obtained through corporate ████ accounts (including ████████████ account) to which they had unauthorized access. The shipping label purchasers typically paid ████ and ████ for the shipping labels they provided via ████[4] or other electronic payment services.

11.    I reviewed account records for ████ and ████ bank accounts and other monetary transfer applications such as ████████████. Activity in both ████ and ████ financial accounts reflects their participation in the shipping label scheme. Both ████ and ████ financial accounts show hundreds of thousands of dollars in income, with many account credits (deposits) specifically referencing ████ labels. Moreover, I identified specific instances in which customers first requested labels from ████ or ████ via Discord, then ████ or ████ sent the customers shipping labels drawn on ████████ account, and then the customers electronically transferred funds to ████ or ████

12.    ████████████████████████
████████████████████████
████████████████

---

[4] Generally, ████ allows individuals to electronically transfer money from their bank account to another user's bank account.



















██ ███   **iMessage Use in Furtherance of the Fraudulent** ██ **Label Sales Scheme**

41. ███████████████████████████████████████████████████████████

██████████████ The group frequently communicated via Apple's iMessage application, and many such communications represent evidence of the group's fraudulent ██ label sales scheme. Moreover, along with financial evidence gathered in this investigation, the iMessages often corroborate ██████ account of the scheme. I believe the examples below clearly establish probable cause that ██████ committed the subject offenses and that his Apple account contains evidence, instrumentalities, contraband, or fruits of said offenses (as iMessage is a proprietary instant messaging service available exclusively on Apple platforms). Additional information regarding Apple and applications such as iMessage and iCloud is included in the next section of this Affidavit. As the iMessages ██████ provided the FBI are voluminous, I have included only a sample sufficient to establish probable cause.

42. On or about July 28, 2021, after the ████████████████ account "went down," ██████ and ██████ exchanged a series of iMessages discussing the change in account status. ██████ ███████████████████████████████ a screenshot demonstrating his inability to sign into the account and speculated somebody from ████████████ changed the account. ███████████████████████████ agreed and expressed discontent, after which ██████ asked whether ████████████ asked "the guy" (who I believe to be ██████ source of access to the ███████████████ ██ account). ██████ responded that he just texted him (presumably ██████ I believe this series of iMessages not only demonstrates ██████ and ██████ fraudulent use of the ███████████████ ██ account, but also confirms ██████ involvement in the scheme (see screenshot below).



43.     On or about July 29, 2021 (the following day), ████████████████

████████, asked if ██████ knew what happened to the account. ████████████████

██████████████, speculated regarding what went wrong, and ██████ replied that his "boy" is

"tight" with ████████ I believe ████████ was referring to his contact at ████████████████ and

suggesting ████████ contact was upset with ████████ (see screenshot below).





44.    On or about August 7, 2021, ▮▮▮▮ sent ▮▮▮▮ screenshots of what appear to be ▮▮▮▮ iMessage communications with ▮▮▮▮ I believe the series of screenshots capture ▮▮▮▮▮▮▮▮▮▮ attempt to negotiate a price at which ▮▮▮▮ and ▮▮▮▮ could regain access to the ▮▮▮▮ account. ▮▮▮▮ noted that people were waiting (I believe referring to customers eager to purchase shipping labels) and that he would pay whatever number was necessary. ▮▮▮▮ suggested ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ indicated he was a middleman and that he was upset he had been paying for account access. I believe ▮▮▮▮ was upset with ▮▮▮▮ and ▮▮▮▮ because ▮▮▮▮ believed ▮▮▮▮ and ▮▮▮▮ abused the ▮▮▮▮ account access without fully informing or compensating ▮▮▮▮ (see screenshots below).





45.    On or about August 8, 2021, ▮▮▮ sent ▮▮▮ iMessages stating, "▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." As previously documented in this Affidavit, both ▮▮▮ recollection and pertinent financial records indicate ▮▮▮ and ▮▮▮ amassed approximately $120,000 cash to make a payment in ▮▮▮ I believe ▮▮▮ and ▮▮▮ communications leading up to the payment suggest the two made payment directly to ▮▮▮ and not to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ and ▮▮▮ communications with ▮▮▮ suggest it was ▮▮▮ and not ▮▮▮ or ▮▮▮ who had a contact at ▮▮▮▮▮▮▮▮ When the ▮▮▮▮▮▮▮ account went down, ▮▮▮ inquired whether ▮▮▮ asked "the guy." ▮▮▮ later referenced his "boy," and stated that he (▮▮▮ was a middleman. I have not seen any communication records supporting ▮▮▮ claim that ▮▮▮ and ▮▮▮ made a direct payment to an individual identified only as ▮▮▮ on the street outside a ▮▮▮▮▮▮ store.

46. ███████████████████████████████████████████████ ██████████████████████████████. On or about September 8, 2021, in the group iMessage between ██████ █████ and ███████ noted they needed to talk about "█████ lady payment." █████ indicated that of course they had to (talk about the payment) and, after some other discussion, ████████████████████████████ asked how much the █████ lady was talking (about). I believe this interaction supports █████ assertion that █████ provided █████ and █████ access to another (this time an █████ █ account (see screenshot below).



47. On the same date, █████ sent █████ and █████ a copy of a text message █████ ████████████ that I believe █████ received from his contact at ███████████████ In fact, █████ followed the message with █████ own iMessage ████████████████ stating, "This █████ guy." The original message sender appeared to express his thanks to █████ and referenced "110 thousand dollars." The "█████ guy" then noted █████ could have given him (the message sender) nothing, and asked █████ to take care of "█████ The message

concluded with the message sender expressing certainty that she ("████ would take care of

████ in return (see screenshot below).



I believe this message, specifically the message sender's gratitude to ████ for $110,000,

suggests ████ provided the message sender $110,000.  I further believe, based on information

already included in this Affidavit, that ████ and ████ provided ████ $120,000 in advance

of ████ payment to the message sender.  Finally, based on the message sender's reference to

"████ soon after ████ and ████ gained access to an ████ ████ account, I believe the

message sender knew and may have even connected ████ with "████ girl" ████ ████ who

I believe provided ████ access to an ████ ████ account.

48.    On or about September 9, 2021, ████ and ████ exchanged iMessages

indicating the account was not working.  ████ ████ and ████ then engaged in similar

iMessage conversation regarding the account, and ████ commented about the "████████

████████ ████ asked what ████ thought it would be and ████ replied,

███████████████████████ ████ replied, "████████████████████████
████████████████" █████████████████████████████████████████████
███████████████████████████████████████████████.

49.    ██████████████████ on or about February 12, 2022, ████ told ████ and
████ the ██████ account was back up and that the group needed to pay ████ ██ for
access.  I reviewed Cash App records suggesting that on February 16, 2022, ████ made three
successive requests for payments from ████ (or ████ made the requests of ████ The three
requests were for $3,000, $2,500, and $500, and each request contained the note "Reparations."
*Note: The records are unclear, and I am thus uncertain whether ████ made the requests of ████*
*or ████ made the requests of ████ Regardless, based on my review, I do not believe any of the*
*requested money transfers took place on this date.*

50.    On or about February 28, 2022, ████ sent an iMessage to ████ and ████
describing "the deal." ████ iMessage describes the required payments to "████ and
discusses a potential profit-sharing arrangement between ████ ████ and ████ (see
screenshot below).



51.    On or about March 2, 2022, ████ sent ████ an iMessage noting, "I'm at work."
████ followed this statement with an image of a laptop computer that appears to have a browser
window open to the ██████████ page of a ████ account.  After zooming in on the original
image, I believe the window is open to the ████ ████ ████ account.  The individual who

took the photo (presumably ███ appears to be holding a marijuana cigarette in front of the computer. I believe ███ message may have been intended as a lighthearted commentary regarding the ease with which the group made money selling ██ labels drawn on corporate accounts (see screenshot below).



52.    On or about March 23, 2022, ████ sent █████ and █████ an image of ██ shipment details for a shipment from "██████████" to "█████████." █████ then sent multiple iMessages seemingly imploring █████ and █████ to smarten up and make things look professional (see screenshots below).



These messages are consistent with messages ▇▇ sent throughout the time the group used the ▇▇▇▇ account. ▇▇▇ frequently advised ▇▇▇ and ▇▇ to use the account judiciously and to limit the number of labels they created each day. ▇▇▇ and ▇▇▇ however, typically argued they needed to make lots of labels to maximize profits.

53.    On or about May 30, 2022, ▇▇▇ sent ▇▇ and ▇▇▇ an iMessage indicating he "▇▇▇▇▇▇▇▇" via Cash App for labels (see screenshot below).

I reviewed Cash App records indicating that on May 29, 2022 (the day before ▇▇▇ sent the above iMessage), ▇▇ sent ▇ $195.00. *Note: Again, because the records are unclear, I am uncertain whether ▇▇ requested the money, ▇▇ sent the money, or both. Regardless, in this instance, it appears ▇▇ did transfer $195.00 to ▇▇*

54.    On or about July 18, 2022, ▇▇ sent ▇▇ and ▇▇ an iMessage asking, ▇▇▇▇▇▇▇▇▇▇▇ then suggested ▇▇ just let him (▇▇ know, and that ▇▇ can send money via Cash App

or wire transfer. ▮▮▮ then sent the following breakdown to ▮▮▮ and ▮▮▮ (see screenshot below).



As ▮▮▮ had already inquired about the "▮▮▮ situation," I believe his above iMessage indicated the group owed her (▮▮▮ ▮▮▮ $15,000. ▮▮▮ further indicated he did not want to give her too much "on digital $ for all reasons." I believe ▮▮▮ statement was indicative of a desire to pay ▮▮▮ in cash to avoid generating records of his payment(s) to her. ▮▮▮ then suggested he could wire funds and ▮▮▮ could take them out of the bank. ▮▮▮ then requested $4,500 via Cash App and $1,500 via Venmo. I believe ▮▮▮ finally indicated he would add $1,500 to that $6,000 (from ▮▮▮ and ▮▮▮ totaling $7,500 he would give to ▮▮▮

55.     I reviewed financial records indicating that on the same date (July 18, 2022), ▮▮▮ and ▮▮▮ sent ▮▮▮ $3,000 and $1,500 via Cash App, respectively. Also on July 18, 2022, ▮▮▮ sent ▮▮▮ girlfriend $1,500 via Venmo. ▮▮▮ and ▮▮▮ thus appear to have complied with ▮▮▮ request for $6,000. I am not aware of ▮▮▮ making any significant cash withdrawals in the following days. Of note, though, I believe ▮▮▮▮▮▮▮▮▮▮

█████████████████ may have had a chilling effect discouraging future transactions related to the scheme, including any planned payments to █████

56.     I believe the above noted iMessage communications establish probable cause to believe ███ ████ violated the subject offenses and that his Apple account (TARGET ACCOUNT ONE) contains fruits, evidence, or instrumentalities of said offenses. ████████

███████████████████████████████████████████████

data from ██████ Apple account is likely to contain additional information relevant to the scheme. Specifically, among other things, I believe data stored on █████ Apple account will contain communications, images, location data, or other information relevant to his interactions with ████████████████████████████████████████████

███████████████ contact, and █████ ████ (individuals from whom I believe

████ obtained unauthorized access to corporate ████ label accounts).

57.     The FBI provided Apple a preservation request regarding data associated with ███

████ Apple account (as well as other Apple accounts associated with this investigation) on August 5, 2022. On August 7, 2022, Apple Privacy & Law Enforcement Compliance confirmed its receipt of the request and indicated applicable data would be preserved for 90 days.

**Account Confirmation**

58.     I obtained and reviewed Apple records confirming ██████ iCloud Apple ID is

██████████████ (TARGET ACCOUNT ONE). The Apple account was created in 2015. The name, physical address, and telephone numbers associated with the Apple ID are all associated with ████████████████████████████

███████████████████████████████████████████████

███████████████ The Apple records confirm ██████ uses numerous iCloud features, including, but not limited to, Calendar, Contacts, iCloud Backup, iCloud Drive, and Messages in iCloud.

## Use of TARGET ACCOUNT TWO in Fraudulent Scheme

59.   As noted previously in this Affidavit, I reviewed emails indicating ██████ (using TARGET ACCOUNT TWO) emailed ████ labels directly to ████████ My review of text messages between ██████ ███████ and █████ suggests █████ and ████████ did not immediately obtain the login credentials for the █████████████ account. Instead, at the beginning of the ████████████ account's use in the scheme, I believe ██████ generated labels at ████████ and █████████ request. This initial arrangement appeared to be a point of contention, as ████████ argued (via text message) █████ and ████████ needed direct access to the ██████ account to effectively operate their online █████ label sales business.

60.   On or about November 5, 2021, ██████ asked (via text message) whether ████████ thought "████ lady" was busy at work. ███████ replied that she was "██████████████," but indicated that if ██████ needed labels he should send the information. ██████████ then sent name and address details for labels from an individual at an address in ██████████████████ to another individual in ██████████ ████████ ██████ also sent a request for labels, but the group decided to first obtain ████████ labels. ████████ asked ██████ to send his "info," and ████████ replied by providing his email address. ████████ asked ██████ to let ██████ know when the labels came in. ███████ later replied, "██████████████████

61.   On the same date, November 5, 2021, ████████████████████████ (TARGET ACCOUNT TWO) sent an email to ██████ at the email address ████████ provided ██████ via text message. The email appeared to contain attachments of shipping labels I believe ████ created through the ███████████████ account. Notably, the labels bear the names and addresses of



the individuals in ▮▮▮▮▮ and ▮▮▮▮▮ ▮▮▮ provided ▮▮▮
via text message.

62.    ▮▮ sent ▮▮▮ additional similar emails containing ▮▮ label attachments later
in November 2021. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮. Based on text messages between ▮▮▮ ▮▮ and
▮▮▮ I believe ▮▮ sent similar emails to ▮▮▮ Like ▮▮▮ ▮▮▮ sent ▮▮▮ address
label information followed by ▮▮▮ email address. After sending the label information
asked, "…▮▮▮▮?"

63.    The emails discussed above, coupled with other evidence set forth in this Affidavit,
then, indicate ▮▮ used TARGET ACCOUNT TWO to distribute fraudulently obtained ▮▮
labels to her co-conspirators.

64.    According to publicly-available Mail Exchange records, emails addressed to the
domain name ▮▮▮▮▮ (the domain name for TARGET ACCOUNT TWO) are
maintained and stored with Google.

**BACKGROUND CONCERNING PROVIDERS' ACCOUNTS**

65.    Apple is the provider of the internet-based account(s) identified by
▮▮▮▮▮ (TARGET ACCOUNT ONE). As noted above, publicly-available
Mail Exchange records indicate that emails addressed to the domain name "▮▮▮▮▮
(TARGET ACCOUNT TWO) are maintained and stored with Google.

66.    PROVIDERS provide subscribers internet-based accounts that allow them to send,
receive, and store e-mails online. PROVIDER accounts are typically identified by a single
username, which serves as the subscriber's default e-mail address, but which can also function as

a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

67. Based on my training and experience, I know that PROVIDERS allow subscribers to obtain accounts by registering on PROVIDERS' websites. During the registration process, PROVIDERS ask subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDERS typically do not verify subscriber names. However, PROVIDERS do verify the e-mail address or phone number provided.

68. Once a subscriber has registered an account, PROVIDERS provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDERS' subscribers can also use that same username or account in connection with other services provided by each PROVIDER.[6]

---

[6] Here, Apple's services may include: iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

Google's services may include: electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web

69.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDERS' servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER servers for a certain period of time.

70.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing, voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and

browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

71.     Based on my training and experience, I know that providers such as PROVIDERS also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDERS also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDERS typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

72.     Based on my training and experience, I know that providers such as PROVIDERS also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDERS in order to track what devices are using PROVIDER accounts and services.  Examples of these identifiers include unique application number, hardware model,

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

73.    PROVIDERS also allows subscribers to access various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDERS are likely to

contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

74.     Based on my training and experience, I know that providers such as PROVIDERS use cookies and similar technologies to track users visiting PROVIDER webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDERS. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDERS may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

75.     Based on my training and experience, I know that PROVIDERS maintain records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

76.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDERS about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as PROVIDERS typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

77.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDERS are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDERS with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

78.    As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDERS can show how and when the account was accessed or used. For example, providers such as PROVIDERS typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[7]

79.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries,

---

[7] At times, internet services providers such as Apple and Google can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of each PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

80.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Kondi Kleinman, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

81.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Apple and Google, who will then compile the requested records at a time convenient to them, there exists reasonable cause to permit the execution of the

requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence

of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on
September 16, 2022.


HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                            Signature

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY TWO<br>PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 22-SC-2408

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

Located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 (Wire Fraud);  18 U.S.C. § 1341 (Mail Fraud);  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending*
18 U.S.C. § 3103a, the basis of which is set fo

*rinted name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone_____ *(specify reliable electronic means)*.

Date: ____9/16/2022____

**G. Michael Harvey**   Digitally signed by G. Michael Harvey
Date: 2022.09.16 11:13:36 -04'00'

*Judge's signature*

City and state: ____Washington, D.C.____

____G. Michael Harvey____
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH TWO ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY TWO<br>PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | )<br>)<br>)      Case No.  22-SC-2408<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search and seizure
of the following person or property located in the jurisdiction of the _____District of Columbia_____.
*(identify the person or describe the property to be searched and give its location)*:

 See Attachment A, hereby incorporated by reference.

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

 See Attachment B, hereby incorporated by reference.

       **YOU ARE COMMANDED** to execute this warrant on or before _____September 30, 2022_____  *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

       Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

       The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
                                                                                                  *(United States Magistrate Judge)*

       ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
       ☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      _____9/16/2022_____          **G. Michael Harvey**  Digitally signed by G. Michael Harvey
                                                                                                  Date: 2022.09.16 11:14:28 -04'00'
                                                                         *Judge's signature*

City and state:      _____Washington, D.C._____          G. Michael Harvey
                                                                         United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-2408 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A-1**
**Property to Be Searched**

This warrant applies to information which is associated with the Apple account identified

by  and which is stored at premises owned, maintained, controlled, or

operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

**ATTACHMENT A-2**
**Property to Be Searched**

This warrant applies to information which is associated with the Google account identified by ██████████████ and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

## <u>ATTACHMENT B-1</u>

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Apple, Inc. ("PROVIDER") to facilitate execution
        of the warrant**

To the extent that the information described in Attachment A-1 is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A-1:

a.    For the time period July 1, 2021 to the present: The contents of all communications

and related transactional records for all PROVIDER services used by an Account subscriber/user

(such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage

services, remote computing services, instant messaging or chat services, voice call services, or

remote computing services including iCloud), including but not limited to incoming, outgoing, and

draft e-mails, messages, calls, chats, and other electronic communications; attachments to

communications (including native files); source and destination addresses and header or routing

information for each communication (including originating IP addresses of e-mails); the date, size,

and length of each communication; and any user or device identifiers linked to each

communication (including cookies);[1]

---

[1] Here, PROVIDER's other services include:  iMessage (instant messages); FaceTime (video
calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access,
share, and synchronize data across various digital devices, for example iCloud Photo Library and
My Photo Stream for images and videos, iCloud Drive for documents, including presentations and
spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity
apps), and iCloud Keychain (to store various usernames and passwords, credit card information,

b.      For the time period from July 1, 2021 to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including iCloud), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period from July 1, 2021 to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period from July 1, 2021 to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of

---

and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

   f.  All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"));

   g.  Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.    For the time period from July 1, 2021 to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    For the time period from July 1, 2021 to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to:



**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning any and all efforts to fraudulently obtain and sell shipping labels, including ███ labels, including attempts to obtain access to or to access corporate shipping label accounts, to use stolen shipping

labels, to market shipping labels for sale, and to sell or otherwise distribute shipping labels;

(f) Information, including messages, communications, emails, notes, documents, audio recordings, pictures, video recordings, or still captured images, that constitutes any effort to fraudulently obtain access to or sell shipping labels;

(g) Information regarding individuals from whom ▇▇▇▇ or others obtained access to corporate shipping label accounts;

(h) Information regarding the identity and whereabouts of any co-conspirators; and

(i) Evidence of financial transactions between ▇▇▇▇ and any co-conspirators.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**ATTACHMENT B-2**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A-2 is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A-2:

a.    For the time period August 1, 2021 to the present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing services including Google Drive), including but not limited to

incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of e-mails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies);[2]

---

[2] Here, PROVIDER's other services include: electronic communication services such as Google
Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video
chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo
sharing), and YouTube (video sharing); web browsing and search tools such as Google Search
(internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome
(web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs

b.      For the time period from August 1, 2021 to the present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including Google Drive), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period from August 1, 2021 to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period from August 1, 2021 to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

(word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account Google Cloud Messaging ("GCM"));

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

    h.    For the time period from August 1, 2021 to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

    i.    For the time period from August 1, 2021 to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

    j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to:



## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)  Information that constitutes evidence concerning any and all efforts to fraudulently obtain and sell shipping labels, including ▮▮ labels, including attempts to obtain access to or to access corporate shipping label accounts, to use stolen shipping

labels, to market shipping labels for sale, and to sell or otherwise distribute shipping labels;

(f) Information, including messages, communications, emails, notes, documents, audio recordings, pictures, video recordings, or still captured images, that constitutes any effort to fraudulently obtain access to or sell shipping labels;

(g) Information regarding individuals to whom ██ provided access to corporate shipping label accounts;

(h) Information regarding the identity and whereabouts of any co-conspirators; and

(i) Evidence of financial transactions between ██ and any co-conspirators.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY TWO PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1343 | SC No. 22-SC-2408 <br><br> **Filed Under Seal** |

*Reference:    USAO Ref. #* ▮▮▮▮▮ *; Subject Account(s):* ▮▮▮▮▮▮▮
▮▮▮▮▮▮

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ▮▮▮▮▮▮ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with the following accounts (collectively, "the TARGET ACCOUNTS"):

   a.  Apple account ▮▮▮▮▮▮▮ ("TARGET ACCOUNT ONE"), which is stored at premises controlled by Apple, Inc. ("Apple"), an electronic communications services provider and/or remote computing services provider which is headquartered at One Apple Park Way, Cupertino, California.

   b.  Google account ▮▮▮▮▮▮▮ ("TARGET ACCOUNT TWO"), which is stored at premises controlled by Google LLC ("Google"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

2.      The information to be searched is described in the following paragraphs and in Attachments A-1 and A-2, which are incorporated by reference.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple and Google ("PROVIDERS") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 and B-2.  Upon receipt of the information described in Section I of Attachments B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2, using the procedures described in Section III of Attachments B-1 and B-2.

3.



4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (Wire Fraud), 1341 (Mail Fraud), and 1349 (Conspiracy to Commit Wire Fraud and Mail Fraud) (the subject offenses) have been committed by ██ ████ ████ ██ ████ ████ ████ ████ and other unidentified individuals. There is also probable cause to search the information described in Attachments A-1 and A-2 for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachments B-1 and B-2.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

7.      The FBI began investigating the fraudulent sale of ███████████████ shipping labels in response to a complaint from ████████████████ . that its ███ account had been compromised. ███████████████ representatives told the FBI its ███ account had been accessed and used to fraudulently purchase shipping labels unrelated to ██████████ ██████ business. ███████████████ believed the fraudulent label purchases began in approximately April 2021 and continued until approximately August 2021, when ████

████████████ became aware of the fraud and closed its compromised ████ account. ████

████████ uncovered the fraud when individuals started complaining about missing

shipments of items such as tennis shoes, pool supplies, and headphones, none of which ████

████████ sells.

        8.      Through analysis of shipments fraudulently drawn on ████████████████

████ account and the interview of individuals associated with the shipments; the FBI identified

████████ ████ as a subject in this investigation. ████ obtained unauthorized access to

multiple company's ████ shipping accounts and sold labels drawn on those accounts to individuals

████ contacted through Discord[3] and other means of online communication. While

investigating ████ the FBI identified ████ ████ as a co-conspirator in the fraudulent ████

label sales scheme. As demonstrated later in this Affidavit, there is probable cause to believe ████

████████ facilitated ████ and ████ unauthorized access to multiple corporate ████

accounts. Additionally, there is probable cause to believe ████ provided ████ access to

an ████████████ account (which ████ subsequently provided to ████ and ████████

        9.      On ████████, The United States District Court for the District of Columbia

issued a search warrant (Case No. ████████) authorizing the search of Discord account material

associated with ████ On ████████, The United States District Court for the District of

Columbia issued a search warrant (Case No. ████████) authorizing the search of Discord

account material associated with ████ Some of the probable cause presented in my affidavits

in support of the ████ and ████ Discord search warrants is incorporated in this Affidavit.

---

[3] Generally, per publicly available information, Discord is a VoIP (Voice over Internet Protocol), instant messaging, and digital distribution platform. Users communicate with voice calls, video calls, text messaging, media and files in private chats or as part of communities called "servers".

10.    In response to the ███ and ███ search warrants, Discord provided the FBI, among other things, electronic copies of ███ and ███ Discord communication history. The search warrant response materials included extensive communications in which many individuals asked to purchase shipping labels from ███ or ███ In response, ███ and ███ provided these individuals electronic copies of ███ shipping labels they obtained through corporate ███ accounts (including ███████████ account) to which they had unauthorized access. The shipping label purchasers typically paid ███ and ███ for the shipping labels they provided via ███[4] or other electronic payment services.

11.    I reviewed account records for ███ and ███ bank accounts and other monetary transfer applications such as ███████████. Activity in both ███ and ███ financial accounts reflects their participation in the shipping label scheme. Both ███ and ███ financial accounts show hundreds of thousands of dollars in income, with many account credits (deposits) specifically referencing ███ labels. Moreover, I identified specific instances in which customers first requested labels from ███ or ███ via Discord, then ███ or ███ sent the customers shipping labels drawn on ███████ account, and then the customers electronically transferred funds to ███ or ███

12.    ███████████████████████████

███████████████████████████

███████████████████

---

[4] Generally, ███ allows individuals to electronically transfer money from their bank account to another user's bank account.



















**██ ███   iMessage Use in Furtherance of the Fraudulent ██ Label Sales Scheme**

41.    ████████████████████████████████████████████████████

████████████    The group frequently communicated via Apple's iMessage application, and many such communications represent evidence of the group's fraudulent ██ label sales scheme. Moreover, along with financial evidence gathered in this investigation, the iMessages often corroborate █████ account of the scheme. I believe the examples below clearly establish probable cause that ████ committed the subject offenses and that his Apple account contains evidence, instrumentalities, contraband, or fruits of said offenses (as iMessage is a proprietary instant messaging service available exclusively on Apple platforms). Additional information regarding Apple and applications such as iMessage and iCloud is included in the next section of this Affidavit. As the iMessages ██████ provided the FBI are voluminous, I have included only a sample sufficient to establish probable cause.

42.    On or about July 28, 2021, after the ████████████████ account "went down," █████ and ████ exchanged a series of iMessages discussing the change in account status. █████████████████████ sent ████ a screenshot demonstrating his inability to sign into the account and speculated somebody from █████████████████ changed the account. ███████████████████ agreed and expressed discontent, after which ████ asked whether ████████████ asked "the guy" (who I believe to be █████ source of access to the ████████████ ██ account). ██████ responded that he just texted him (presumably ████ I believe this series of iMessages not only demonstrates ██████ and ███████ fraudulent use of the ██████████████ ██ account, but also confirms ███████ involvement in the scheme (see screenshot below).



43.    On or about July 29, 2021 (the following day), ███████████████████

████████ asked if ██████ knew what happened to the account. ██████████████████

███████████, speculated regarding what went wrong, and ██████ replied that his "boy" is

"tight" with ██████  I believe ██████ was referring to his contact at ████████████████ and

suggesting ██████ contact was upset with ██████ (see screenshot below).



44.    On or about August 7, 2021, ▮▮▮▮ sent ▮▮▮▮ screenshots of what appear to be ▮▮▮▮ iMessage communications with ▮▮▮▮ I believe the series of screenshots capture ▮▮▮▮ attempt to negotiate a price at which ▮▮▮▮ and ▮▮▮▮ could regain access to the ▮▮▮▮ account. ▮▮▮▮ noted that people were waiting (I believe referring to customers eager to purchase shipping labels) and that he would pay whatever number was necessary. ▮▮▮▮ suggested ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ indicated he was a middleman and that he was upset he had been paying for account access. I believe ▮▮▮▮ was upset with ▮▮▮▮ and ▮▮▮▮ because ▮▮▮▮ believed ▮▮▮▮ and ▮▮▮▮ abused the ▮▮▮▮ account access without fully informing or compensating ▮▮▮▮ (see screenshots below).



45.    On or about August 8, 2021, ▮▮▮▮ sent ▮▮▮▮ iMessages stating, "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." As previously documented in this Affidavit, both ▮▮▮▮ recollection and pertinent financial records indicate ▮▮▮▮ and ▮▮▮▮ amassed approximately $120,000 cash to make a payment in ▮▮▮▮ I believe ▮▮▮▮ and ▮▮▮▮ communications leading up to the payment suggest the two made payment directly to ▮▮▮▮ and not to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ communications with ▮▮▮▮ suggest it was ▮▮▮▮ and not ▮▮▮▮ or ▮▮▮▮ who had a contact at ▮▮▮▮▮▮▮▮▮▮▮▮▮ When the ▮▮▮▮▮▮▮▮▮ account went down, ▮▮▮▮ inquired whether ▮▮▮▮ asked "the guy." ▮▮▮▮ later referenced his "boy," and stated that he (▮▮▮▮ was a middleman. I have not seen any communication records supporting ▮▮▮▮ claim that ▮▮▮▮ and ▮▮▮▮ made a direct payment to an individual identified only as ▮▮▮▮ on the street outside a ▮▮▮▮▮▮▮▮ store.

46.    ████████████████████████████████████████████████

████████████████████████████    On or about September 8, 2021, in the group

iMessage between ██████  ██████  and ████████ noted they needed to talk about "████

lady payment." ██████ indicated that of course they had to (talk about the payment) and, after

some other discussion, ████  ████████████████████████ asked how much the

██████  lady was talking (about).  I believe this interaction supports ████████ assertion that

████  provided ████  and ████  access to another (this time an ████████  account (see

screenshot below).



47.    On the same date, ██████ sent ██████ and ██████ a copy of a text message ████████

████████████ that I believe ██████ received from his contact at ████████████████  In

fact, ██████ followed the message with ████████ own iMessage ████████████████ stating,

"This ████████ guy."  The original message sender appeared to express his thanks to ██████ and

referenced "110 thousand dollars."  The "████████ guy" then noted ████████ could have given him

(the message sender) nothing, and asked ████████ to take care of "████████  The message

concluded with the message sender expressing certainty that she ("███████ would take care of ███ in return (see screenshot below).



I believe this message, specifically the message sender's gratitude to ███████ for $110,000, suggests ████ provided the message sender $110,000. I further believe, based on information already included in this Affidavit, that ██████ and ██████ provided ██████ $120,000 in advance of ██████ payment to the message sender. Finally, based on the message sender's reference to "██████ soon after ██████ and ██████ gained access to an ██████ ███ account, I believe the message sender knew and may have even connected ██████ with "██████ girl" ████ ███ who I believe provided ██████ access to an ██████ ███ account.

48.    On or about September 9, 2021, ██████ and ██████ exchanged iMessages indicating the account was not working. ██████ ██████ and ██████ then engaged in similar iMessage conversation regarding the account, and ██████ commented about the "████████ ████████ ██████ asked what ██████ thought it would be and ██████ replied,

████████████████████████ ██████ replied, "████████████████████████
████████████████" ██████████████████████████████ ████████ ████████
████████████████████████████████████████████████████████████████

49.     ████████████████ on or about February 12, 2022, ██████ told ██████ and
██████ the ████████ account was back up and that the group needed to pay ██████ ██ for
access.  I reviewed Cash App records suggesting that on February 16, 2022, ██████ made three
successive requests for payments from ██████ (or ██████ made the requests of ██████  The three
requests were for $3,000, $2,500, and $500, and each request contained the note "Reparations."
*Note: The records are unclear, and I am thus uncertain whether* ██████ *made the requests of* ██████
*or* ██████ *made the requests of* ██████  *Regardless, based on my review, I do not believe any of the*
*requested money transfers took place on this date.*

50.     On or about February 28, 2022, ██████ sent an iMessage to ██████ and ██████
describing "the deal." ██████ iMessage describes the required payments to "████████ and
discusses a potential profit-sharing arrangement between ██████ ██████ and ██████ (see
screenshot below).



51.     On or about March 2, 2022, ██████ sent ██████ an iMessage noting, "I'm at work."
██████ followed this statement with an image of a laptop computer that appears to have a browser
window open to the ████████████ page of a ██████ account.  After zooming in on the original
image, I believe the window is open to the ██████ ██████ ██████ account.  The individual who

took the photo (presumably ██████ appears to be holding a marijuana cigarette in front of the computer. I believe ██████ message may have been intended as a lighthearted commentary regarding the ease with which the group made money selling ██ labels drawn on corporate accounts (see screenshot below).



52.    On or about March 23, 2022, ██████ sent ██████ and ██████ an image of ██ shipment details for a shipment from "███████████" to "██████████." ██████ then sent multiple iMessages seemingly imploring ██████ and ██████ to smarten up and make things look professional (see screenshots below).



These messages are consistent with messages ▮▮▮ sent throughout the time the group used the ▮▮▮▮ account. ▮▮▮ frequently advised ▮▮▮ and ▮▮▮ to use the account judiciously and to limit the number of labels they created each day. ▮▮▮ and ▮▮▮ however, typically argued they needed to make lots of labels to maximize profits.

53.    On or about May 30, 2022, ▮▮▮ sent ▮▮▮ and ▮▮▮ an iMessage indicating he "▮▮▮▮▮▮▮▮" via Cash App for labels (see screenshot below).

I reviewed Cash App records indicating that on May 29, 2022 (the day before ▮▮▮ sent the above iMessage), ▮▮▮ sent ▮▮ $195.00. *Note: Again, because the records are unclear, I am uncertain whether ▮▮ requested the money, ▮▮▮ sent the money, or both. Regardless, in this instance, it appears ▮▮▮ did transfer $195.00 to ▮▮▮*

54.    On or about July 18, 2022, ▮▮▮ sent ▮▮▮ and ▮▮▮ an iMessage asking, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" ▮▮ then suggested ▮▮▮ just let him (▮▮▮ know, and that ▮▮▮ can send money via Cash App

or wire transfer. ▮▮▮▮ then sent the following breakdown to ▮▮▮▮ and ▮▮▮▮ (see screenshot below).



As ▮▮▮▮ had already inquired about the "▮▮▮▮ situation," I believe his above iMessage indicated the group owed her (▮▮▮ ▮▮▮ $15,000. ▮▮▮▮ further indicated he did not want to give her too much "on digital $ for all reasons." I believe ▮▮▮▮ statement was indicative of a desire to pay ▮▮▮ in cash to avoid generating records of his payment(s) to her. ▮▮▮▮ then suggested he could wire funds and ▮▮▮▮ could take them out of the bank. ▮▮▮▮ then requested $4,500 via Cash App and $1,500 via Venmo. I believe ▮▮▮▮ finally indicated he would add $1,500 to that $6,000 (from ▮▮▮ and ▮▮▮▮ totaling $7,500 he would give to ▮▮▮

55.    I reviewed financial records indicating that on the same date (July 18, 2022), ▮▮▮▮ and ▮▮▮ sent ▮▮▮ $3,000 and $1,500 via Cash App, respectively. Also on July 18, 2022, ▮▮▮ sent ▮▮▮ girlfriend $1,500 via Venmo. ▮▮▮ and ▮▮▮ thus appear to have complied with ▮▮▮ request for $6,000. I am not aware of ▮▮▮ making any significant cash withdrawals in the following days. Of note, though, I believe ▮▮▮▮▮▮▮▮▮▮

███████████████ may have had a chilling effect discouraging future transactions related to the scheme, including any planned payments to ████

56.     I believe the above noted iMessage communications establish probable cause to believe ████  ████ violated the subject offenses and that his Apple account (TARGET ACCOUNT ONE) contains fruits, evidence, or instrumentalities of said offenses. ████████

████████████████████████████████████████████████████████

data from ████ Apple account is likely to contain additional information relevant to the scheme.  Specifically, among other things, I believe data stored on ████ Apple account will contain communications, images, location data, or other information relevant to his interactions with ████████████████████████████████████████████

█████████████ contact, and ████  (individuals from whom I believe ████ obtained unauthorized access to corporate ████ label accounts).

57.     The FBI provided Apple a preservation request regarding data associated with ████ Apple account (as well as other Apple accounts associated with this investigation) on August 5, 2022.  On August 7, 2022, Apple Privacy & Law Enforcement Compliance confirmed its receipt of the request and indicated applicable data would be preserved for 90 days.

**Account Confirmation**

58.     I obtained and reviewed Apple records confirming ████ iCloud Apple ID is ████████ (TARGET ACCOUNT ONE).  The Apple account was created in 2015.  The name, physical address, and telephone numbers associated with the Apple ID are all associated with ████████████████████████████████

████████████████████████████████████████████████

███████████  The Apple records confirm ████ uses numerous iCloud features, including, but not limited to, Calendar, Contacts, iCloud Backup, iCloud Drive, and Messages in iCloud.

**Use of TARGET ACCOUNT TWO in Fraudulent Scheme**

59.    As noted previously in this Affidavit, I reviewed emails indicating ████ (using TARGET ACCOUNT TWO) emailed ████ labels directly to ██████  My review of text messages between ████ ████ and ████ suggests ████ and ██████ did not immediately obtain the login credentials for the ██████████ account. Instead, at the beginning of the ██████ account's use in the scheme, I believe ████ generated labels at ██████ and ██████ request. This initial arrangement appeared to be a point of contention, as ████ argued (via text message) ████ and ██████ needed direct access to the ████ account to effectively operate their online ████ label sales business.

60.    On or about November 5, 2021, ████ asked (via text message) whether ██████ thought "████ lady" was busy at work. ████ replied that she was "██████████," but indicated that if ████ needed labels he should send the information. ██████ then sent name and address details for labels from an individual at an address in ██████████████ to another individual in ██████ ██████ ████ also sent a request for labels, but the group decided to first obtain ██████ labels. ████ asked ████ to send his "info," and ████ replied by providing his email address. ████ asked ████ to let ██████ know when the labels came in. ██████ later replied, "██████████

61.    On the same date, November 5, 2021, ████████████████ (TARGET ACCOUNT TWO) sent an email to ████ at the email address ██████ provided ████ via text message. The email appeared to contain attachments of shipping labels I believe ████ created through the ██████████ account. Notably, the labels bear the names and addresses of

the individuals in ████████████████ and ████████ ████ ████ provided ████ via text message.

62.    ████ sent ████ additional similar emails containing ████ label attachments later in November 2021. ████████████████████████████████████ . Based on text messages between ██████ ████ and ██████ I believe ████ sent similar emails to ██████ Like ██████ ██████ sent ████ address label information followed by ██████ email address. After sending the label information asked, "…████████?"

63.    The emails discussed above, coupled with other evidence set forth in this Affidavit, then, indicate ████ used TARGET ACCOUNT TWO to distribute fraudulently obtained ████ labels to her co-conspirators.

64.    According to publicly-available Mail Exchange records, emails addressed to the domain name ████████████ (the domain name for TARGET ACCOUNT TWO) are maintained and stored with Google.



### BACKGROUND CONCERNING PROVIDERS' ACCOUNTS

65.    Apple is the provider of the internet-based account(s) identified by ████████████████ (TARGET ACCOUNT ONE). As noted above, publicly-available Mail Exchange records indicate that emails addressed to the domain name "████████████ (TARGET ACCOUNT TWO) are maintained and stored with Google.

66.    PROVIDERS provide subscribers internet-based accounts that allow them to send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as

a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

67.     Based on my training and experience, I know that PROVIDERS allow subscribers to obtain accounts by registering on PROVIDERS' websites.  During the registration process, PROVIDERS ask subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDERS typically do not verify subscriber names. However, PROVIDERS do verify the e-mail address or phone number provided.

68.     Once a subscriber has registered an account, PROVIDERS provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDERS' subscribers can also use that same username or account in connection with other services provided by each PROVIDER.[6]

---

[6] Here, Apple's services may include:  iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

Google's services may include: electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web

69.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDERS' servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER servers for a certain period of time.

70.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing, voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber.  Based on my training and

---

browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

71.    Based on my training and experience, I know that providers such as PROVIDERS also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDERS also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDERS typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

72.    Based on my training and experience, I know that providers such as PROVIDERS also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDERS in order to track what devices are using PROVIDER accounts and services.  Examples of these identifiers include unique application number, hardware model,

operating system version, Global Unique Identifier ("GUID"), device serial number, mobile

network information, telephone number, Media Access Control ("MAC") address, and

International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know

that such identifiers may constitute evidence of the crimes under investigation because they can

be used (a) to find other PROVIDER accounts created or accessed by the same device and likely

belonging to the same user, (b) to find other types of accounts linked to the same device and user,

and (c) to determine whether a particular device recovered during course of the investigation was

used to access the PROVIDER account.

73.    PROVIDERS also allows subscribers to access various services through an

application that can be installed on and accessed via cellular telephones and other mobile

devices.  This application is associated with the subscriber's PROVIDER account.  In my training

and experience, I have learned that when the user of a mobile application installs and launches the

application on a device (such as a cellular telephone), the application directs the device in question

to obtain a Push Token, a unique identifier that allows the provider associated with the application

(such as PROVIDER) to locate the device on which the application is installed.  After the

applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud

Messaging) sends a Push Token to the device, the Token is then sent to the application, which in

turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider

needs to send notifications to the user's device, it sends both the Push Token and the payload

associated with the notification (*i.e.*, the substance of what needs to be sent by the application to

the device).  To ensure this process works, Push Tokens associated with a subscriber's account are

stored on the provider's server(s).  Accordingly, the computers of PROVIDERS are likely to

contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

74.     Based on my training and experience, I know that providers such as PROVIDERS use cookies and similar technologies to track users visiting PROVIDER webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDERS.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDERS may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

75.     Based on my training and experience, I know that PROVIDERS maintain records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

76.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDERS about issues relating to the account, such as technical problems, billing

inquiries, or complaints from other users. Providers such as PROVIDERS typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

77.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDERS are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDERS with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

78.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDERS can show how and when the account was accessed or used.  For example, providers such as PROVIDERS typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[7]

79.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries,

---

[7] At times, internet services providers such as Apple and Google can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of each PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

80.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Kondi Kleinman, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

81.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Apple and Google, who will then compile the requested records at a time convenient to them, there exists reasonable cause to permit the execution of the

requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence

of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on
September 16, 2022.

G. Michael
Harvey

Digitally signed by G. Michael
Harvey
Date: 2022.09.16 11:16:05
-04'00'

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____
[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                                    Signature