# ATTACHMENT

# A

*Redacted Docket Materials*

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE<br>ACCOUNT STORED AT PREMISES CONTROLLED<br>BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 371 | )<br>)<br>)<br>)<br>)<br>)    Case No. 23-SC-1505 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 (False Statements); 18 U.S.C. § 371 (Conspiracy to Defraud the United States); 18 U.S.C. § 1519 (Falsification of Records); 52 U.S.C. §§ 30116 (Unlawful Excessive Campaign Contributions) and 30104(b) (Reporting Requirements Campaigns). | |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sh████████████

████████████████

*Applicant's signature*

████████████████

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone_____ *(specify reliable electronic means).*

Date: _____6/28/2023_____

Digitally signed by G.████
Harvey
Date: 2023.06.28 11:21:58 -04'00'

*Judge's signature*

City and state: _____Washington, D.C._____

G.████ Harvey
United States Magistrate Judge

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means ☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE<br>ACCOUNT STORED AT PREMISES CONTROLLED<br>BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR<br>INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 371 | ) ) ) ) ) ) )    Case No.  23-SC-1505 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the jurisdiction of the _____District of Columbia_____. *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____July 12, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. ▮▮▮ Harvey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

| | |
|---|---|
| Date and time issued: _____6/28/2023_____ | *[signature]*  Digitally signed by G.<br>Harvey<br>Date: 2023.06.28 11:22:33 -04'00'<br>*Judge's signature* |
| City and state: _____Washington, D.C._____ | G. ▮▮▮ Harvey<br>United States Magistrate Judge |

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SC-1505 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the Google LLC account identified by "█████████████████████ (Google Account ID ███████████ and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.    **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
       execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, PROVIDER is required to disclose the following information to the

government corresponding to the account listed in Attachment A:

For the time period of January 1, 2020, to the present:

A.    All records, including voice recordings, video calls, messages, shared files,

archived files, channel activity, log files, and domain history.

B.    The contents of all communications and related transactional records for all

PROVIDER services used by an  Account subscriber/user (such as Gmail (electronic mail),

Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant messaging

and video chats, previously called Hangouts), Google+ (social networking), Google

Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing);

web browsing and search tools such as Google Search (internet searches), Web History

(bookmarks and recorded browsing history), and Google Chrome (web browser); online

productivity tools such as Google Calendar, Google Contacts, Google Docs (word

processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps

(maps with driving directions and local business search) and other location services, and

Language Tools (text translation); online tracking and advertising tools such as Google

Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting

based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications))), including but not limited to incoming, outgoing, and draft emails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of emails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);

C.     The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as Gmail (electronic mail), Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant messaging and video chats, previously called Hangouts), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications)), including any information generated, modified, or stored by user(s) or

PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

      D.    All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

      E.    All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account  or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

      F.    All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

      G.    All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument

numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s);

H.     Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

I.     All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken; and

J.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within **14 days** of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:



## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1001 (False Statements); 371 (Conspiracy to Defraud the United States); 1519 (Falsification of Records); 52 U.S.C. §§ 30116 (Unlawful Excessive Campaign Contributions); and 30104(b) (Reporting Requirements Campaigns) as described in the affidavit submitted in support of this Warrant, including, but not limited to information pertaining to the following matters:

    (a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

    (b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

    (c) Information that constitutes evidence indicating the account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning fraudulent and false disclosures filed with the Federal Election Commission (FEC);

(f) All information related to the following individuals and entities and their work for ██████████ and their work for, connection to, association with, or knowledge of any aspect of ██████ ██████████ ████████████ (including their respective officers, employees, and consultants or contractors):

    a. ██ ██████

    b. ██████ ██████

    c. ██ ████

    d. ██████ ████

    e. ██████ ████

    f. ████████ ██████

    g. ██████ ██████

    h. ████ ██████

    i. ████████████████

    j. ████████████

    k. ██████████████

    l. ████████████

    m. ██████

n. ████

o. ████████

p. ████████

(g) All records related to ██ ████████████████ including:

a. Receipt of contributions / donations: records of all funds and contributions received, including the full name and address, occupation and employer of donors; the date of receipt; the amount of funds provided; the source of funds (i.e., cash, check, credit card or wire) and photocopies or images of any contribution over $50; and all records of deposit for all funds;

b. Disbursement of funds: records of all disbursements and expenditures (operating and independent), including the dates, amounts, and purpose of all expenditures, including the recipient of the funds, and any receipts, invoices, correspondence or cancelled checks relating to such expenditures;

c. Refunds of donations: records of all refunds of donations, including dates, amounts and reason for refunds and all requests for refunds, whether honored or not;

d. Solicitations: emails, direct mailings, scripts, website pages and advertisements reflecting communications between the entities listed above and any donors or prospective donors;

e. Correspondence to or from any political campaigns or campaign committees

f. Work products: campaign strategy documents, presentations, ballot access initiatives, fundraising strategies, campaign website building/operation

g.   Debts, obligations and loans;

h.   Reports and Public Disclosures or Filings:  records relating to disclosures made to the FEC, including regular reporting and specific responses to FEC inquiries, and including records and communications related to the preparation or content of any such reports, disclosures, or statements and any records or communications related to any FEC audit; and

i.   Retention Agreements and Fee Arrangements:  records relating to the retention of all services, including a description of services provided, the identity of the parties to the transactions, the amount of fees and the source of the funds.

III.    **Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.  As part of this search, the Government will segregate and exclude from the seized data set information that may be subject to assertions of the attorney-client privilege.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. 371 | SC No. 23-SC-1505 <br><br> **Filed Under Seal** |

*Reference:  USAO Ref. #* ▮▮▮▮▮▮    *Subject Account(s):* ▮▮▮▮▮▮▮▮▮▮▮▮

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮, being first duly sworn, hereby depose and state as

follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for

information which is associated with one account – that is, ▮▮▮▮▮▮▮▮▮▮▮▮

("TARGET ACCOUNT") – which is stored at premises controlled by Google LLC

("PROVIDER"), an electronic communications services provider and/or remote computing

services provider which is headquartered at, and which accepts service at, 1600 Amphitheatre

Parkway, Mountain View, California 94043. The information to be searched is described in the

following paragraphs and in Attachment A. This affidavit is made in support of an application for

a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require

PROVIDER to disclose to the government copies of the information (including the content of

communications) further described in Section I of Attachment B. Upon receipt of the information

described in Section I of Attachment B, government-authorized persons will review that

information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

      2.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

      3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

      4.    As set forth herein, I respectfully submit that there is probable cause to believe that individuals associated with the ████ ██████████████ of ████ ████ undertook efforts to conceal from the ████████████████████ and the public the nature and scope of contributions to, and expenditures by, ████████ . Based on my training and experience and the facts as set forth in this affidavit, I respectfully also submit that there is probable cause to believe that evidence, instrumentalities, contraband, or fruits of violations of 18 U.S.C. §§ 1001 (False Statements), 371 (Conspiracy to Defraud the United States), 1519 (Falsification of Records), 52 U.S.C. §§ 30116 (Unlawful Excessive Campaign Contributions) and 30104(b) (Reporting

Requirements Campaigns) as further described in Attachment B will be found in the search of the information described in Attachment A.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. §§2711.  18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As more fully set forth below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

6.      The FBI is investigating the conduct of ████████ the authorized ████████ ████████ for ████ ████ ████ ████████████, and certain individuals that the FBI believes to have participated in its operations, for: making false statements to the Federal Election Commission (FEC); unlawfully concealing the recipients of ████████████; and accepting ████████████ in excess of the legal limits.  The conduct under investigation includes ████████ listing fake or shell businesses as recipients of its ████████████ in reports filed with the FEC to avoid ████████ reporting requirements.  It further includes a pass-through scheme in which ████████s payments to one law firm were routed through an accounting firm that acted as a conduit.  The accounting firm was then falsely reported to the FEC as the recipient of the payments, rather than the law firm which was the actual recipient of tens of thousands of dollars from ████████  Finally, it includes this same law firm making in-kind contributions in excess of legal limits to ████████ in the form of tens of thousands of dollars in unreported legal services.

███████████████████████████████

7.      The Federal Election Campaign Act ("FECA" or "the Act") requires political committees to file reports with the Federal Election Commission ("FEC") documenting the committee's contributions and expenditures.[1]  With respect to expenditures, the Act requires a political committee to report the name and address of each person to whom it made expenditures or other disbursements aggregating more than $200 per calendar year, or per election cycle for authorized committees, as well as the date, amount, and purpose of such payments.[2]    These reporting requirements are intended to ensure public disclosure of "how [political campaign money] is spent."[3]  The Act criminalizes "knowingly and willfully" violating "any provision" of the Act "which involves the . . . reporting of any . . . expenditure."[4]

8.      Under FECA, contributions are subject to contribution limits.  In the ████████ ███████████ a ██████ ███████ could accept only $2,800 for the primary and $2,800 for the general election from individuals, and $2,000 for the primary and $2,000 for the general election from other candidate committees.[5]    In addition to direct monetary contributions, in-kind

---

[1] 52 U.S.C. § 30104(a).

[2] *Id.* at § 30104(b)(5) (requiring committees to disclose "the name and address of each person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet a candidate or committee operating expense, together with the date, amount and purpose of such operating expenditure"); *id.* at § 30104(b)(6) (applying requirement to authorized committees in election cycles); 11 C.F.R. § 104.3(b)(4)(i), (vi) (authorized committees); *id.* at § 104.9(a), (b) (political committees).

[3] *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *see also Citizens United v. FEC*, 558 U.S. 310, 369-71 (2010) (describing the importance of disclosure requirements to serve informational interest, because "transparency enable the electorate to make informed decisions").

[4] 52 U.S.C. § 30109(d)(1)(A)(i).

[5] *Contribution Limits for 2019-2020*, Federal Election Commission, https://www.fec.gov/resources/cms-content/documents/contribution_limits_chart_2019-2020.pdf.

contributions (such as the purchase of services or goods by an individual or other political committee for a candidate committee's benefit) are considered a contribution subject to these limits.[6]

9.      Knowingly falsifying FEC reports also violates 18 U.S.C. § 1519, which prohibits "making a false entry in any record" with intent to "impede, obstruct, or influence" the "proper administration of any matter within the jurisdiction" of a federal agency.  And knowingly and willfully falsifying FEC reports violates 18 U.S.C. § 1001(a), which prohibits "falsifying, concealing, and covering up by any trick, scheme, or device a material fact" that relates to "any matter within the jurisdiction" of the federal government.

10.     Anyone who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States" is "punishable as a principal."[7]

### Federal Law Prohibits the Use of Pass-Through Schemes to Conceal Political Expenditures

11.     Along with statutes such as 52 U.S.C. §§ 30104 and 30109, 18 U.S.C. § 1001, and 18 U.S.C. § 1519, FEC authority also prohibits the use of pass-through schemes to conceal campaign expenditures.

12.     FECA and its relevant implementing regulations do not address the concept of ultimate payees and subcontractors with regard to payee reporting,[8] and the Commission generally

---

[6] 11 C.F.R. 100.52(a) and (d).

[7] 18 U.S.C. § 2(b).

[8] "Neither the [Federal Election Campaign] Act nor the [Federal Election] Commission's relevant implementing regulations address the concept of ultimate payees, vendors, agents, contractors, or subcontractors in the context of payee reporting."  Matter Under Review ("MUR") 7784 at 5 (Make America Great Again PAC, *et al.*), Statement of Reasons of Chairman Allen J. Dickerson and Commissioners  Sean  J.  Cooksey  and  James  E.  "Trey"  Trainor,  III)  (June  9,  2022)

does not require political committees to report the money indirectly paid to ultimate payees or sub-contractors who are contributing to the direct vendor's reported work with the political committee.[9] But the Commission *has* determined "that merely reporting the immediate recipient of a committee's payments will not satisfy the requirements of section 30104(B)(5) *when the facts indicate that the immediate recipient is merely the conduit for the intended recipient of the funds*."[10]

13.    For example, the Commission has found that a political committee should have reported payments to:

- a phone banking vendor routed through the political committee's media firm, where the campaign did not want to list the vendor on its disclosure reports and the media firm had no involvement in the provisions of the vendor's service;[11]

- a state senator routed through a campaign strategies vendor, where the political committee believed state ethics rules prohibited its paying the state senator, the state senator denied being employed by or being under any contract with the vendor, and the vendor had no independent control of the funds it received from the political committee which were earmarked for the state senator;[12]

- a state senator routed through a business entity, where the committee "made the decision to hire [the state senator] and negotiated the terms of his compensation, and [the state senator] took no direction from [the business entity] nor performed any work for [it]."[13]

---

(https://www.fec.gov/files/legal/murs/7784/7784_42.pdf) (quoting Factual and Legal Analysis ("FLA") at 14, MUR 7923 (Friends of David Schweikert) (citations omitted)

[9] "As a general matter, 'the [Federal Election] Commission has concluded that a committee need not separately report its consultant's payments to other persons – such as those payments for services or goods used in the consultant's contract with the committee.'"  *Id.* (quoting FLA at 12, MUR 6510 (Kirk for Senate)).

[10] *Id.* (emphasis in the original) (quoting FLA 8-9, MUR 6724 (Bachmann for President)).

[11] Conciliation Agreement at 3-4, MUR 4872 (Jenkins for Senate 1996).

[12] FLA at 10-11, MUR 6724 (Bachmann for President).

[13] FLA-Committee at 4 and 10, MUR 6800 (Ron Paul 2012 Presidential Campaign Comm.).

████ ██ *announces* ██ *bid for* ███████████ *and* ██████████

14.    ███ ████ ████████████ is an ████████████████████████ ███████████████. On ████████ ████ announced that ██ was running for ████████████████



15.    ██████████████ a "Statement of Candidacy" (Form 2) was filed with the FEC, which is located in Washington, D.C.  The Form 2 identified ████ as a member of the ████ ███████████████████████, and " ██████ as designated ███████████ ██████

16.    On ███████, ███████ was registered with the FEC as the principal campaign committee for ████ ████████ ███████.  A ██████ website, www.█████████ was also established which described ████ ██████████.

17.    ████ ████ was named as the campaign's treasurer and custodian of records in FEC filings.  According to his LinkedIn page, ██████ was the Finance Operations Director for ███████ appears to be a general title for ████ ████ various corporate holdings, based on

corporate filings for ███ ██████████ ████ █████████ and ██████████████

which all list ████ as a manager, member, or chief financial officer.

████████ ***Conceals Expenditures to a Public Relations Firm:*** ██████████████

18.    ██████████████ is a public relations firm hired by ████████ According

to its website, ██████████████ offers a range of services, including campaign strategy and

management, digital strategy and management, marketing, voter targeting, and advertising.

According to ██████████████ website, ████ ████ is its founder and ██ █████

is a principal.

19.    According to Cooperating Witness #1 ("CW 1"), ██████████████ at times,

anonymized clients that hired the organization for public relations campaigns.

20.    According to CW 1, his business consulting company, "Business A", worked with

██████████████ on two projects where the actual client was intentionally anonymized.[14]

21.    According to public reporting, ██████████████ has a long history of doing

consulting work for the ██████████████

---

[14] For example, ██████████████ hired Business A in ████████ to work on a ████ to influence
████ ████ The purpose of the █████ was to influence citizens to contact their ████████ █
with requests about the ████ ████ According to CW 1, the client was a ████████ that did not
want to be publicly associated with this ████████ According to CW 1, he was instructed not to refer to
the client in written communications. ████████ also hired Business A to work on a campaign
related to ████ policy in ████ The ██████████ was to ████ against a ███████ for
██████████ The client, and ultimate cut-out, another public relations firm, did not want the
public to know of its affiliation with the ██████



22.     The investigation has revealed that in its reports to the FEC, ████████ reported

payments to ████████████████ as payments to "████████████████████████

LLC's address is listed as ████████████████████████ which is the same

address as one of ████████████████ office locations.  According to CW 1, ████████ said

that the entity ████████████████ would be used to keep a legal separation between ████████

████████████ and its work for ████████████  According to CW 1, as a result, ████████████

████████ name was taken off Business A's business's sales pitch presentation to ████ ████

23.     Business A was hired by ████████ to do work for ████████  Business A sued

████████████ and ████████████████ over a business dispute, alleging that ████████ and

████████████████ failed to pay Business A for ████ ████ of dollars of work that done

for the ████████ ("the lawsuit").  Emails publicized by the lawsuit reveal that ████████ ████

and other ████████████████ Employees used their ████████████████ email accounts

and held themselves out as ████████████████ employees, not ████████████████

employees, while working on ████ ████████  For example:

- ████████████████, ████████████████ CEO ████ ████ emailed ██
  ████ from ████████████████ regarding ████████ fundraising.
  ████████ included ████████ on the email and noted "he is the point person on
  fundraising."

- ████████████████, ████████████ ████ ████████████ emailed,
  among others, ████ and ████ an owner of one of ████████s vendors,
  regarding "the ████ website," listing "████████████████ in his signature
  line and noting that one of the addressees on the email "was once an ████ peep and
  helps us out as an outside vendor on projects like this."

- ████████████ ████ emailed ████ at ████████████████████████
  ████████████████ the email address ████████████████████
  ████████.

24.     According to CW 1, ████████████████ also utilized Slack Technologies,

Inc. ("Slack") to facilitate ████████████████.  Slack is an electronic communications

services provider and/or remote computing services provider. CW 1 stated that the Slack communications included detailed day-to-day communications regarding the ██████████████ and strategy with numerous members of the ████████████ CW1 stated that the Slack account utilized for the ███████████████ was under ████████████████████. On ██████████████ United States Magistrate Judge Robin M. Merriweather signed a search warrant authorizing the search of this Slack account (Case No. ██████████).

25.    Although ██████ ████████ and others were conducting business as ██████ ██████████ while working for ████████ according to FEC filings, ████████████████ LLC received a total of ████████████ in ████████████ from ██████████ for work detailed in the below table:

| Description | Amount |
|---|---|
| Ballot Access Consulting | |
| Ballot Access Costs | |
| Ballot Access Filing Fee | |
| Ballot Access Services | |
| Ballot Access Services, Printing, Travel | |
| Ballot Access Travel Expenses | |
| Printing | |
| Travel Expenses | |
| Voter File Fees | |
| **Total** | |

26.    ██████████ did not report any payments to ████████████████ to the FEC.

*██████████* ***Conceals Expenditures for Legal Work:***
*██ ██ **and** ██████ ██*

27.    ██ ██ is a state ████████████████████████████ ████████████████████████████████████████████████████ ██████████████. In addition to serving as the state ████████████████████████, ██

████ is ██████████████  ████████  ██████  ██████████████████████ ("██████
██████ a law firm.

28.    ██████ identified herself as "the attorney for the ████ ████ ████████████████
campaign" in an email Business A  regarding FEC compliance.  Additionally, CW 1 and his
██████████████ described ██████ as "the ringleader" of the ████████ .

29.    Federal law allows for legal and accounting services to be volunteered in support
of a political committee without qualifying as expenditures against a candidate's contribution limit
"if the services are solely to ensure compliance with the Act or 26 U.S.C. §§ 9001 *et seq.* and 9032
*et seq.*"[16]  The political committee must still report amounts paid for by the employer of the person
rending such services, even in the case of those services related to FECA compliance that do not
qualify as expenditures against the candidate's contribution limits.

30.    ██████████ s internal ████████ communications reveal, and CW 1 affirmed, that
██████ provided legal advice related to FEC reporting requirements that would not qualify against
her contribution limits per C.F.R. § 100.146.  But ██████ also provided services to the ████████████
that extended beyond "solely [ ] ensur[ing] compliance with the Act or 26 U.S.C. 9001 *et seq.* and
9032 *et seq.*"  These services included providing advice regarding several states' ballot access laws
and regarding the required election filings for official write-in candidate status in several states.

31.    According to CW 1:

- ██████ made all executive decisions for the ████████ ██████ , and, according
to CW 1, ██████ ██████ (mentioned above) described her as the "powers that be."

- ██████ worked on matters related to mail-in ██████████████████████
effecting the ████████ , and getting ████ on ████████████████████████████

---

██ C.F.R. § 100.146; *see also* 11 C.F.R. § 100.146 (same, contributions).

- ████████ served a role in hiring vendors. For example, according to CW 1, ████████ hired ████████████████ after being dissatisfied with a previous consultant named ████████

32.    ████████████████ sent CW 1's business an email threatening legal action. According to CW1, the dispute was over what CW 1 alleged to be unpaid bills for the work his business did on behalf of ████████ CW 1's business received the email after it restricted the campaign's access to its Shopify account because of the unpaid bills. I have reviewed this email, which on its face implies that ████ services to the campaign extended beyond FECA compliance. In the email, ████ represents herself as "the attorney for the ████ ███ ████ ████████████████ states that continued negotiations with ████████████████ over Business A's compensation for its work will likely lead to expensive civil litigation that "both of us would like to avoid;" and offers Business A $20,000 to "transfer full control of the ████ merchandise store ████████ so that they can properly wind down its operation as the political campaign it is attached to is no longer in operation."

33.    Moreover, exhibits to Business A's lawsuit against ████████ demonstrate that ████████ provided legal services to the campaign that appeared to extend beyond "solely [ ] ensur[ing] compliance with the [Federal Election Campaign] Act or 26 U.S.C. 9001 *et seq.* and 9032 *et seq.*":

- ████████████████, ████████ sent an email to members of the campaign team regarding write-in ballot standards ████████████████ and recommended that they "sue ████████ get a declaratory judgment that stamps are ok and then use them."

- ████████████████ sent ████████ edits to a proposed legal disclaimer nguage regarding a privacy policy.

- ████████, ████████ sent an email to people involved with the campaign stating that "██ team has already begun researching event restrictions we might come up against in ████████ as it relates to ████" The next day, ████████ emailed that "█ sent us all the ████████████ restrictions for the locations

we are considering for the campaign schedule." █████ was among the recipients of both emails.

34. According to FEC records, ████████ never reported payments to, or in-kind contributions from, █████ or █████████ ████

35. █████████████ is a ████████ accounting and FEC compliances services firm which worked for ████████

36. An FBI analysis of bank statements obtained from ██████████ Inc. reveal that it appeared to be a conduit to conceal ██████████ s payments to ███████ ███ for legal services. Specifically, bank statements revealed multiple examples, bullet-listed below, of █████ ████████ receiving tens of thousands of dollars in expenditures from ████████ that were reported to the FEC as payments to ████ for "compliance and accounting services," followed by █████████████ quickly transmitting most of the money it received to ████████ ███ In each instance, ████████████ would not have had sufficient funds in its bank account prior to the expenditures from ████████ to make the subsequent remittance to ████████ And in each instance, while the money was paid to █████████████ ████████ reported it as a payment to ████ despite FEC records showing "███ had never previously received expenditures from any campaign, while ██████████████ has been receiving expenditures since ████ :

- ██████████████████ ████████ paid██████████ to █████████████
  ██ reported the payment as two separate expenditures, one for ████████ as "compliance services", and the other ████████ as "accounting services" to ███ – not █████████████ – for the same total amount of ███████████ to the FEC. At the time of the payment, █████████████ had approximately ████████ n its bank account. One day later, █████ paid ████████ – the exact amount that ██████████ reported as paying ████ for "compliance services" – out of the same bank account to █████████ This payment constituted nearly 82% of what ████████████████ received from ██████████ the previous day and approximately 76% of the money in its bank account at the time of the withdrawal.

- ████████████, ████ ████████ to ██████ and reported a expenditure for "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ██████ had approximately ██████ its bank account. Three days later, ████ paid ██████ ██ █ ████████ – nearly 77% of what it received from ████ and approximately 91% of the money in its bank account at the time of the withdrawal.

- ████████████ ████ ████████ "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ██████ had approximately ██████ its bank account. Seven days later, ████ paid ████ ██ ████████ nearly 63% of what it received from ████ and approximately 67% of the money in its bank account at the time of the withdrawal.

- ████████████ ████████ paid ██████ to ████████████ and reported a expenditure for "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ██████████ had approximately ████ its bank account. Six days later, ████ paid nearly 80% of what it received from ████ and approximately 89% of the money in its bank account at the time of the withdrawal.

- ████████████, ████████████ to ████████ and reported a expenditure for "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ████████ had approximately ████ its bank account. The next day, ████ paid ██████ █ █ ██████████ – nearly 65% of what it received from ██████ and approximately 70% of the money in its bank account at the time of the withdrawal.

- ████████████, ████████ paid ████ to ██████ and reported a expenditure for "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ████ had approximately ████ its bank account. Seven days later, ████ paid ████ █ approximately ██████ – nearly 77% of what it received from ████ and approximately 88% of the money in its bank account at the time of the withdrawal.

- ████████████, ████████████ to ████████ and reported a expenditure for "compliance and accounting services" to ████ for the same amount to the FEC. At the time of the payment, ██████ had approximately ████ its bank account. Seven days later, ████ paid ████ ██ approximately ████ nearly 76% of what it received



from ███████ and approximately 65% of the money in its bank account at the time of the withdrawal.

37.    According to FEC filings, since 2011, ██████ other than ██████ have reported a total of ███████ in expenditure to ████████ Of that amount, over 90% was reported as payments for "accounting," and less than 10% was reported as "compliance" or "accounting/compliance." ██████ on the other hand, reported less than 10% of its expenditure to ███ Inc as "accounting," and over 90% as "compliance" or "accounting/compliance."

███████ *Conceals Expenditures to a Second Public Relations Firm:*
████████

38.    ████████ is a public relations firm which, according to its website, provides services across multiple disciplines, including political consulting, public opinion research, strategic communications and media relations, and advocacy advertising.

39.    According to public reporting, ████████ is a ████████ ████ d ██████ one of its officials, confirmed that he worked with ██████ in its early stages to "connect the campaign with various people, groups."[17]    According to public reporting, "higher-ups at ████████ were hesitant about affiliating with the [██ and ████████ so they devised an arrangement with ████████ whereby payments to ████████ would actually go to ████████[18] Moreover, according to public reporting, ████ ████████ acknowledged that payments to ████████ occurred.[19] And ██████ told ██████

---

[17] ████████████████████████████████

█ ████████████████████████████

[19] Id.

████████ that the firm was assisting ████ '████████████████████████████████

████████████████████ he declined to tell ████████ why the ████████ did not report any

payments to ████████[20]

    40.    According to FEC records, ████████████████ received████████████████

expenditures from the ████████ campaign from ████████████████ According to bank

records, ████████████ wired ████████████████ ████████ in total across multiple

wires from ████████████

    41.    Additionally, according to CW 1, ████ engaged ████████████████ to work

for ████████ but she ultimately became dissatisfied with their work and replaced them with

████████████

    42.    According to FEC records, ████████ never reported payments to, or in-kind

contributions from, ████████████

    ████████ ***Conceals Expenditures to an Accounting Firm on FEC Reports:***
    ***Accountant*** ████████ ████ ***and*** ████████████

    43.    According to FEC records, ████████████████ has received ████████ from

various ████████ in expenditures for bookkeeping, accounting, and compliance services since

2011.

    44.    According to FEC records, ████████████ has received expenditures for FEC

compliance services as recently ████████████ (from the '████████████████████').

According to public reporting, ████████████████ and ████████ have been

associated to ████████████ in the past.[21]

---

[20] Id.

[21] ████████████████████████████████████████████████████████████

████████

45.    █████ ████ has been identified as an employee of ████████████ through emails made public in the lawsuit filed by CW 1's company against ██████████ ("the lawsuit").[22]    According to the FEC's website, she is also the treasurer of an independent ███████████████ named ██████████████████.[23]

46.    The investigation has revealed that in its reports to the FEC, ████████ disguised its payments to ██████████████ by reporting them as payments to "████████"

47.    According to CW 1, ██████ collected information from the ████████ for ████████ s FEC filings[24] and referred to herself as a "glorified bean counter." Exhibits filed in the lawsuit demonstrate that █████ held herself out as working for ████████████ when she worked for ██████████

48.    In an email ██████████████████, ██████ ██████ emailed ████ ████ and ██████ ██████ to request information related to a bank account held by the ████████ She sent the email address from ██████████████████ and the signature line read, "████████ ██████ ███████████████████████████

49.    ██████████████████ used the same ██████████████ email account to email ████████ and ████ In the email, ██████ requested access to ████████████ s Shopify account for FEC reporting and "reconciling deposits made to the ██████████████."

50.    ██████████████████ used the same ██████████████ email account to email ████████████ and others, regarding information needed to set up the ████████████ store authentication process with Shopify.

---

[22] Law enforcement is investigating whether █████ also has an ownership interest in ████████████████████
█ ██████████████████████████

[24] Law enforcement is investigating who made the FEC filings.

51.    Despite ████████████ and ████ work for ████████ the campaign never reported expenditures to ████████████ on any of its FEC reports.  It did, however, report ████████ in expenditures to "████ ████ since ████████ for compliance and accounting services.

52.    According to FEC records, the expenditures from the ████████ campaign are the only instances in which "████ ████ has appeared in any in FEC filings.  The FEC reports lists ████████ address as being located in ████████████ the same city where ████████ is located.  But there is no record of ████████ being registered in the state of ████████.

53.    The investigation has revealed that the email account services utilized by ████████ for her work for the campaign, ████████████████████ are provided by Google LLC.  A domain, network, and email service provider lookup for ████████████ revealed that that the email account services utilized by ████████████ were provided by Google LLC.  And a Grand Jury subpoena issued for basic subscriber information to Google LLC revealed the account ████████████████ belongs to ████ ████ and has the Google Account ID # ████████.

### The Target Account

54.    Google LLC, headquartered in Mountain View, California, is a technology company which provides search engine technology, cloud computing, computer software, online advertising, e-commerce, quantum computing, and email services, among other services.  According to its website, Google's mission is to "organize the world's information and make it universally accessible and useful."



55.    Emails made publicly available from Business A's lawsuit against ███████ and ████████████████ show █████ █████ of ████████████ utilizing the email account ████████████████ (Target Account 1) to conduct business for ██████████

56.    According to publicly available emails, Target Account 1 corresponds with employees of ████████████████ ██████████ treasurer ████████ ██████████ and among others, ████ ██████ while conducting business for the ██████████ campaign.

57.    Accordingly, I expect that Target Account 1 will contain, among other things, information explaining the scope and nature of ████ ████████ involvement in ██████████ including the legal services she provided, but did not report.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

58.    PROVIDER is the provider of the email account identified by ████████████████████

59.    PROVIDER provides its subscribers internet-based accounts that allow them to send, receive, and store messages online. PROVIDER accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

60.    Based on my training and experience, I know that PROVIDER allows subscribers to obtain accounts by registering on PROVIDER's website. During the registration process, PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

61.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[25]

62.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

63.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period

---

[25] For Google, the services may include: electronic communication services such as Gmail (electronic mail), Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant messaging and video chats, previously called Hangouts), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications).

of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

64.    Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

65.    Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.  Such devices can be identified in

various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

66.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider

needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

67.    Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

68.    Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

69.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

70.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

71.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training

and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[26]

---

[26] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

72.    Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

73.    In this case, I seek this electronic information because the information connected to the use of the TARGET ACCOUNT may lead to the discovery of additional evidence, including but not limited to evidence of knowing and willful violations of FECA's reporting requirements, including the falsification of records and execution of a pass-through scheme in which a conduit was used to hide payments made to a law firm.

**REQUEST TO SUBMIT WARRANT BY TELEPHONE
OR OTHER RELIABLE ELECTRONIC MEANS**

74.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Timothy Visser, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

**CONCLUSION**

75.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,



Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 28, 2023.

Digitally signed by G.
Michael Harvey
Date: 2023.06.28
11:22:58 -04'00'

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE